Here I represent Shelby Trahan individually and on behalf of his deceased father, James Adam Trahan. This arises from a summary judgment rendered at the district court level, which all arises from a shooting, a fatal shooting that occurred at Mr. James Trahan's home on April 6, 2013. In essence, well, in fact, Your Honor, without getting into the details, an overview of this case is Mr. Trahan was inside his home at 3 o'clock a.m. when the police came to his home. Two police officers entered his home. As they approached the home, the only other person living there, a female, a girlfriend, who was heard by neighbors yelling, There is no God. And that was a domestic call that was received by the police and possibly gunshots were heard. The police are approaching this house. Despite the fact they don't have an address and are assuming it's the right address, as they're approaching the house, Ms. Bankston exits the house, closes the door, comes down and tells the police officers, Everything's fine. We don't need you. At which point, Officer Smith, police officer, and there's a video in this case, a dash cam video, Officer Smith, standing to the right side of the door, slaps the door open and peers inside the room and sees the deceased, James Adam Trahan, standing. And both officers agree that Mr. Trahan is standing there with his arms crossed, that he has no shirt on, that he has no gun in his hand, that he doesn't have a weapon on him, that he's wearing a pair of blue jeans, and that there is apparently some type of a black nylon empty holster on his hip, and that the police officers made entry into his home. We don't believe that there was a probable cause for entry into the home at that point for two reasons. Number one, the district court pointed out that the law was clearly that a police officer does not need a warrant unless there is aid required inside the home or someone is under threat. There were only two people in the home, and the only other person besides the deceased who was present was outside with the police behind them. And a review of the video reflects that this woman, Bankston, obviously has some type of a relationship with these police officers. They don't take her like a suspect. They basically receive her down the steps, and they spend only a second or so with her and turn her back and tell her to stay put as they make entry into this man's home. And we believe that the Fourth Amendment was created to protect people from entry into their castles, their dwelling, at 3 o'clock a.m. in the morning. And this gentleman, unfortunately, ended up dying as a result of the interaction. As the police officers entered the house, the video depicts what happens at that point. And as the trial court correctly pointed out, we agree with that when there's video evidence, a greater weight to the video should be taken from the scene. However, the court weighs the evidence of everything that occurred after the police officers leave the video and are inside the house and are not viewed. And despite the fact that the entire confrontation with Mr. Trahan cannot be viewed, factual conclusions are rendered, and they are certainly not rendered in a light most favorable to the non-moving party. And no inferences are drawn in favor of the non-moving party. In fact, all inferences are drawn in favor of the police. According to the police officers, one police officer, Officer Smith, says that Officer Broussard Well, I'll back up a second. They tell him to show his hands, in which case they both agree. He pulls out his hands, shows the palms of his hands, and then crosses his arms again. They continue to say to show his hands or else he's going to be tased. At which point Mr. Trahan, in his own home, says, If you're going to shoot me, you're just going to have to shoot me, presumably, the taser, in the back. And he turns his back on him and begins to walk away. And Officer Smith says Officer Broussard tased him at that point. Officer Broussard says that Mr. Trahan went and leaned over a couch for some reason and he was afraid that he might have a weapon there. And he tased him, despite the fact that the taser reflects that the LED screen on the taser reflects that it was not fired until 30 minutes after the shooting. And there are no taser wounds on Mr. Trahan's body. And, therefore, we believe clearly the inferences should be drawn in favor of the fact he was not tased and, therefore, wasn't posing a risk. Based on the testimony of the police officers, at no time prior to this alleged tasing was he ever armed. When he was standing in front of them and showed his hands, they claimed he might have been able to hold a weapon in his armpits. I don't know how. But they also say when he turned his back to them, he showed his bare back and dropped his arms and clearly could not have been armed at any point therein. Yet, instead of backing off or leaving it alone, they charged, fired a taser, allegedly. And Officer Broussard says that he runs up and he grabs Mr. Trahan in a bear hug, essentially. And Mr. Trahan grabs a shotgun that is laying on the other side of the couch and comes up and they both turn left. The shotgun somehow goes off and they claim that Officer Smith is wounded in the leg by that shotgun blast. These are all inferences and conclusions drawn in favor of the police, whereas we believe that the facts show differently. In fact, we know the facts show differently. There were five shell casings taken from the scene of the shooting of Mr. Trahan's home that were fired by Officer Broussard. Officer Broussard claims that he grabbed Mr. Trahan around the back in a bear hug and that Mr. Trahan at some point got him in a headlock and that he drew his gun from his right side and began firing into the torso of Mr. Trahan. It's physically impossible, and the ballistics don't match, that this man could have been in a headlock on the right side of Mr. Trahan and began firing his gun and struck him because the only bullet wounds in Mr. Trahan is a bullet wound to his left side, the complete other side. There's no way that this police officer could have reached around and shot him from that angle at an upward angle where the bullet stopped in the right armpit of Mr. Trahan. The other bullet wounds are in his back pretty close together, but all three wounds reflect a different distance of fire. The shot to the left side reflects that it was fired from a further distance than the other two shots to the back because the stippling pattern of the gunpowder on the wound was greater to the left side than it was to the ones on the back. There was a gunshot to the right side that showed a fairly large stippling pattern, smaller than the shot to the left, but there was also a gunshot to the left side that shows a soot in the wound with a raised abrasion collar indicative of a gun being placed right up close to the flesh when it was fired to make matters worse, with inferences drawn in favor of the nonmoving part of Mr. Trahan herein. A review of the photographs of these shots and Mr. Trahan's body as it existed afterwards, and it's a gruesome task to have to look at it, but it reflects that there is a graze wound on Mr. Trahan's left arm that the coroner states matches the size of a .40 caliber projectile, and as he's handcuffed, and he's handcuffed in these photographs, where his arms are lined up. And you can see because the blood pools on each side after. When a person dies, the blood seeks the lowest spot of the body, and where the arms are at, the skin is much clearer. And when the arms are in that position where they were as handcuffs, the graze wound across the left wrist lines up perfectly with the wound into the left side of Mr. Trahan's back. None of these ballistics can be possible from a headlock position on the right side of Mr. Trahan. However, to Officer Bruce Hart's credit, he does go on and indicate afterwards that after having fired bullets somehow into the torso of Mr. Trahan, that he let go, went limp, and fell to the ground. According to Officer Smith, both of them were on the ground. In an audio statement he gave to the state police, he stated both officers were on their back inside the home, and Officer Bruce Hart had Mr. Trahan in a bear hug, and Officer Smith is grappling for the shotgun, and eventually gets it away from him, throws it at the door, it bounces back. He said he got it out of the door, which is inconsistent with Officer Bruce Hart's statement. He says he carried the gun outside, but that's not as great an issue considering the video contradicts them both and reflects that Officer Smith grabs a hold to the barrel of the shotgun and slides it down the steps of the stairs of the house. There are five shots that are fired by Officer Bruce Hart inside the house. Of the five shots, there are several that are completely unaccounted for in the district court's ruling or by the defense or anyone in this case, including the coroner. The shot to the left side that I mentioned, there is a shot fired through the shotgun butt of the weapon that Mr. Trahan had that enters on the right side of the butt of the shotgun at a downward 45-degree angle exiting the inside butt of the shotgun and leaves a bullet fragment inside the stock. There are pieces of debris from that stock that are on the floor inside the Trahan house. The lower court stated that there was no reason to believe that that defect in the gun wasn't there beforehand. However, we would point out respectfully that the inferences should be drawn in favor of the evidence. There is a bullet in the stock of that shotgun and pieces of debris there that reflect that one of those shots hit that shotgun. That's three shots to Mr. Trahan that can't really be accounted for. One shot, they hit the stock of the shotgun, and there's five shell casings. The fifth shot, the only other shot that could have been, because there is no other mark in the house where that bullet could have gone, is, in fact, the shot that struck Officer Smith's right leg. He gave audio statements to the state police at the beginning of this case and stated that, as I indicated earlier, he was inside the home grappling for the shotgun between Officer Bruce's office. Is there any question the shotgun was fired? There is a lot of indication the shotgun was fired. It shows that the shotgun was fired and it hit the floor of the house and ricocheted upwards and hit the door of the house. Officer Smith states in his audio that he was standing closer. So you're saying Officer Smith was shot by? I'm saying he was shot by Officer Broussard. That's the inferences drawn. And I'll tell you why. Your Honor, quickly, I'll say I've got a yellow light here. Officer Smith states that he was standing closer to Mr. Tronholm when that shotgun was fired than the ricochets off the floor, that he was within five feet of that shotgun. He has a clean wound through and through his leg. Had he been standing within four or five feet of him? So no shell fragment, no pellets, no anything got removed from Officer Smith's leg? No, sir. None? The medicals reflect that he had a through and through wound. One? One wound clean through his right leg, and that accounts for the fifth shot of the shell case fired by. So a shotgun was fired? Well, at some point, Your Honor, but we also have. How many shells in the shotgun? It was, I believe it had three shells in it, maybe more. Buckshot? It was a pump shotgun with buckshot in it. It was never pumped. There was never a live round placed back in it. And I'm not sure if I've got one minute left or if that's rebuttal time. You've got a minute left. Keep going. All right. We have additional evidence, Your Honor, of Ms. Bankston's rather disturbing relationship with the police at the scene after this shooting occurred. She's actually affectionate to Officer Smith out on the ground stroking his head. You don't have any independent evidence of a special relationship between Ms. Bankston and her? We have social media. You do? Yes. We have social media evidence. Prior to or subsequent to the incident? I believe it was subsequent to. All right. She is a nurse. She worked for a doctor as opposed to being a nurse. She said she was a nurse, but the evidence reflected she, in fact, worked in a doctor's office as opposed to being a nurse who was out there treating a woman. So she's not a nurse? That's right. All right. That's right, Your Honor. In addition to all of this, Judge, your time has expired. Oh, I apologize. Thank you. Good morning, Your Honors. Edward Barus of Bourne, Wilkes, and Robilly on behalf of the defendants. I couldn't help but notice that Mr. Spear made no reference to the applicable law or any consideration of qualified immunity, but I did take some notes and did think it was important to first address a couple of factual recitations that he made that are clearly belied by the record in Judge Hanna's memorandum opinion. First off, the door was never closed completely. I agree with Mr. Spear that video evidence should be considered most strongly. If your Honors had the opportunity to review the video, you will note that while there is an attempt to close the door, it is never completely opened, thereby giving both deputies a clear line of sight. It says never completely closed. That's correct. When you say not completely closed, do you just mean that the latch wasn't engaged? Is that what you mean? There's a discernible gap. So in other words, to the extent the argument has been made that the door was affirmatively closed completely and one of the officers, for example, had to manipulate a door handle or anything, there was a discernible gap in the door that's clearly depicted on the video. And that's important because it gives both officers a line of sight to Mr. Trawhon, who was in the residence. There was a domestic call, shots fired. It's clearly depicted on the video that there is debris strewn around the house indicative of some domestic incident. And they know that there were shots fired. There's an empty holster on the gentleman. There's no sign of where the weapon may be. I also take issue with Mr. Speer's recitation of the timeline of the interaction between the officers once they're inside the residence. There were commands for Mr. Trawhon to show his hands. It's my appreciation that he made a very fleeting motion, which is also how Judge Hanna described it. And so they still were not able to determine if Mr. Trawhon had a pistol on his person. He did indicate he was noncompliant with commands. He walked away from the officers. And this is all in tight quarters. And as Judge Hanna provided in his memorandum ruling, he provided a timeline of events. Almost immediately after Mr. Trawhon indicated that he was not going to comply with commands, he reached over the couch to grab something. Deputy Broussard assumed it was a weapon, which it was. It's the testimony of Deputy Broussard that contemporaneously with Mr. Trawhon bending over the couch, the taser was deployed. There was not a good connection, apparently, because Mr. Trawhon was not incapacitated. The coroner did testify that unless there's a barb or hook present on a body, he has no way of determining whether contact was made. So that's the explanation provided by the coroner as to why Mr. Trawhon was not incapacitated. And when Mr. Trawhon came back over the couch, he did, in fact, have a shotgun. Now, Magistrate Hanna noted that once the officers entered the residence, they affirmatively made it, well, first off, Deputy Smith at no time discharged his weapon. That's undisputed by the record. Deputy Smith, unfortunately, was only shot. And I think it's clearly belied by the evidence. His weapon was never fired. Deputy Smith never discharged his weapon. That's correct. Maybe we're talking about two. You said he never discharged his weapon. Deputy Smith was not fired by anybody in that house that night. Deputy Smith is the deputy who had the misfortune of showing up and being shot through the leg. But his weapon was not fired by anybody, not just by him, by anybody. That's correct. He wasn't fired with his weapon. That's correct. That's correct, Your Honor. Now, with regard to the shotgun. Yes. Any ballistics to determine whether or not the injury to Deputy Smith was caused by the shotgun blast? Well, there's no ballistics evidence, but I would disagree with Mr. Spears' representation of the medical records. It was a, I mean, the size of the wound indicates that it only could have come from a shotgun. I mean, the surgical report indicates that. Deputy Smith provided his own testimony. It was a surgical report. It indicates the size of the wound, or the doctor concludes that it had to have been made by a shotgun blast. Your Honor, if I recall correctly, there was a specific indication of the type of injury, which indicated because it was a large open wound that expanded outwards once within the leg cavity, that it only could have come from a shotgun shot. That's the doctor's opinion? Is that what you're saying? That's my recollection, Your Honor. That's correct. All right. There's the issue of the taser. Mr. Spear conveniently omitted the fact that there was testing done. It is admitted that the taser unit was not synchronized, and so that there was a possibility of time drift, which at the time of oral argument at the trial court level, Mr. Spear's colleague admitted that it's inconclusive, that there's certainly no way to tell when the taser was actually discharged. But, again, turning to the timing of events, there was clearly a fluid grappling between Deputy Broussard and Mr. Traha. And, again, Magistrate Hanna noted that they were sending the force continuum in the opposite direction. They both had their pistols holstered when they entered the house. Deputy Broussard, first attempt to taser Mr. Traha. When that was ineffective, he attempted to physically grapple with him. So, in other words, there was no officer discharged a weapon until after the shotgun was produced, and the uncontradicted testimony is that the shotgun was discharged first. Deputy Broussard only discharged his service weapon after that time. Can you explain how it is, the trajectory of that bullet? Could it have been the way it was given? Well, Deputy Broussard testified about that, and he did say that he was under Mr. Traha's right arm. But the testimony was that, for one thing, they were in motion. They were not static. He did say that Mr. Traha's side was pointed towards the floor. Nowhere does it say that he was on the floor, as Mr. Spear has suggested. And the coroner was specifically asked about that shot, and he said that type of shot is certainly possible. So, in terms of anyone commenting upon whether that shot was possible, the coroner said that it was. It's Deputy Broussard's testimony that he did fire that shot once he was placed inside a headlock. And as your honors know from the record, the testimony is that once Mr. Traha was shot the first time, he was on top of the shotgun. Now, this is another important thing that's clearly depicted in the video. Deputy Smith, after he's been shot through the leg, is seen in the doorway grappling with the shotgun. Now, presumably the only person who had been trying to regain control of the shotgun in his struggle would be Mr. Traha. And that's an important differentiation for some other cases that have been decided by the Fifth Circuit, as to whether the variety of shots fired after an initial shot, once a subject is faced down on the floor. Mr. Speer's firm was involved in another one of these cases, but in this case, the testimony is clear and unrefuted that Mr. Traha was still struggling for the shotgun, presumably still had within his power to use the shotgun, and provide further harm to either the deputies or Ms. Bankston, who was inside the residence at the time. The coroner was also asked about that. He said he was certainly of the opinion that Mr. Traha could have continued to offer resistance and perhaps use the firearm again at the time that Deputy Broussard fired the last two shots. This issue about missing bullets, I'd respectfully suggest that's never been briefed or discussed at any point before today. So I'm certainly not prepared to discuss it, because this is the first time it's been brought up on appeal. As for the alleged rapport between Ms. Bankston and one of the deputies, that's much ado about nothing. It's not competent evidence to oppose a summary judgment. And as you specifically asked, Mr. Speer, it was only interaction after the date of the incident, in fact, a year over the incident. But having addressed those factual issues, as you know, we hear there was a well-plaid qualified immunity motion for summary judgment that was granted at the district court level. And, of course, I wrote to your honors to bring to the panel's attention some recent United States Supreme Court decisions, specifically Casella v. Hughes and District of Columbia v. Wesby, because the Supreme Court has provided some very recent guidance about what should be considered when there's an assertion of qualified immunity, and specifically in the Fourth Amendment context, excessive force cases. As your honors know, the Supreme Court has said, both in Wesby and Casella, that when qualified immunity is approved, the plaintiff has to prove, one, a constitutional violation, and, two, that the actions of the defendants were not objectively reasonable in light of the law that was clearly established at the time of the incident. Now, the Supreme Court has spoken about that at length in Wesby and Casella. They say that to be clearly established for qualified immunity purposes, a legal principle must have a sufficiently clear foundation of an existing precedent. It must be dictated by controlling authority or a robust consensus of cases of persuasive authority. That it is not enough that it is suggested by an existing precedent, but it must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Now, imagine should Hannah, in his memorandum ruling, which was made part of the appeal record, said as follows. This court also finds that there was no clearly established statutory constitutional right that gave Deputy Broussard fair warning that he could not use deadly force under the circumstances where, one, in response to a domestic violence call with shots fired, two, the victim is seen with an empty holster and no sign of the weapon, three, the victim refuses to follow instructions and retrieves a shotgun with discharges after multiple attempts to use non-deadly force have proved unsuccessful, and four, the victim does not relinquish the shotgun without resistance. And, of course, the Fifth Circuit has also found that there was no excessive force used in circumstances in which the facts were very similar to the case before us, that there was an imminent threat of harm that still could be posed by the individual with the weapon. There's been some issue about the timing of the officer's interaction once inside the residence, and everyone has to agree that we can only see the action in the doorway. But I would respectfully suggest that the narrative that was provided by the deputies, as Your Honors know, things happen very quickly in these situations. Officers have to make split-second decisions based on their training, and it was the un ñ I mean, there were only three witnesses who could be deposed, Ms. Bankston and both of the deputies. And their testimony is uniform, as noted by Magistrate Hanna, and viewing the facts, excuse me, the evidence in the light most favorable to the non-moving party. Now, of course, that's the evidence. Mr. Spear, I would suggest, and a lot of what he proffered in his argument was arguments of counsel as opposed to evidence that is in the record. The evidence is clear that ñ Well, there is, but there's no inconsistency about the shotgun being discharged first, there being a struggle for the weapon, and that, I mean, Officer Smith was pulling on the shotgun, which is partially visible in the doorway, with Deputy Trahan. Deputy Trahan was also trying to prevent Mr. Trahan, excuse me, Deputy Broussard was trying to prevent Mr. Trahan from being able to regain control of the weapon and use it again. So, and of course, the excessive force analysis, of course, is limited to what the officers reasonably perceived at the time excessive force was used. And so I would suggest that at the time all three shots were fired, there were close quarters, there were two deputies, and Ms. Bankston, Mr. Trahan, had the shotgun. He'd already shot it once. He'd injured Deputy Smith, shot him through the leg, and that he still had control of that weapon. And so, therefore, that's why the service pistol of Deputy Broussard was discharged, because Mr. Trahan had control of the weapon. He'd already fired once and intended to fire again, given the opportunity. I want to go back to the probable cause for a moment. Yes. For the search. Yes. Are you contending there was no search because the door was never closed, and so they were just looking inside an open door, or is it your contention that there were exigent circumstances so that a warrantless search was permissible? I'm glad you asked, Your Honor. It was our position in our briefing before the district court that there were, in fact, exigent circumstances. And as Magistrate Hanna noted in his memorandum of opinion, the U.S. Supreme Court said in Brigham City, Utah, a 2006 decision that law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. And we know after the fact that Ms. Bankston and Mr. Trahan were the only two occupants of the house. The officers had no way of knowing that. And, of course, there is also consideration that an officer can give that the suspect who may have a weapon may, in fact, harm themselves. There's been numerous decisions by both the Fifth Circuit and Supreme Court about that. And so I apologize for my focus on the door issue. It was not suggesting that we weren't taking up the issue of the presence of exigent circumstances. That's precisely what I did argue at the district court, and that's what Magistrate Hanna. So even if the door had been completely closed, your view would be that exigent circumstances would have justified opening the door? Well, there is a U.S. Fifth Circuit decision that is cited in my aptly brief. The plaintiff's name was Caesar v. City of Eunice. In that instance, the door was completely closed. But, again, the video depicts in this instance that the door was not completely closed, and Deputy Smith was to the right side of the door and therefore had a line of sight on Mr. Trahan, Again, an individual with an empty holster on his hip with a report of a gun discard. I also wanted to bring to the Court's attention that, for example, Magistrate Hanna also had this to say about entering the house. The officers did not know the location of the handgun that fit the holster. Although Ms. Bankston attempted to assure the deputies that everything was all right when they encountered her at the door of the house, it is reasonable for the deputies to suspect that Mr. Trahan may be intending to harm Ms. Bankston or himself once they saw inside. When Mr. Trahan refused to show his hands, it was reasonable for them to enter the home in order to attempt to diffuse the situation. And then on a footnote, that decision I just sent a reference for you, Brigham City, Utah v. Stewart, was cited by the Court. Deputy Hanna, excuse me, Magistrate Hanna also provided a timeline with his memorandum opinion, saying that based on the uncontroverted testimony of the deputies, it's uniform in response to your previous question about the order in which any weapons were discharged. The shotgun was discharged first, and that led to Deputy Broussard's actions to shoot Mr. Trahan once, and then when he was capable of appearing to be able to use the shotgun once again, firing the last two shots. I see that I am close to out of time, so I'll hear if any of the Justices have any questions. Thank you, Your Honor. Thank you very much, Your Honors. Rebuttal. Yes, Your Honor, I'll be brief. I would like to address, number one, the indication that I came up with Officer Smith's statement that these two individuals were on the ground inside the house. The State Police audio statement they took of Officer Smith reflects clearly that he states that Officer Trahan had Mr. Officer Broussard had Mr. Trahan a bear hug. They were on the ground, and Officer Smith was over him trying to grapple for that gun. So that statement is clearly found in the audio of the investigations taken by the State Police. The total amount of argument that was presented here, with the exception of the entry into the home, is dealing with things that happened inside the home, and therein lies the substance of this appeal for the appellant. None of the inferences were drawn in favor of the appellant. There is a clear indication that this taser was not fired at this man. He has no taser wounds. The LED reflector was 30 minutes or more afterwards. And if you look at the picture of the taser inside the home, the prongs are laying and they appear bent on a hardwood floor, and all the cord that is attached to them when they're fired is piled up in a pile as if it was fired directly into the ground where it just stayed. There's no indication that Mr. Trahan was shot at all. Inside the home, the presence of the pistol that they're talking about that might have gone in that holster, there are photographs of a pistol sitting pristinely under a cushion on a couch inside that home. And then in a photograph right next to those is a photograph of the living room with that furniture turned upside down. So we've got photographs of the inside of this home in good condition, with the exception of Mr. Trahan's body and blood. And then we've got photographs of the furniture flipped upside down, and there's no way a pistol could have been hid inside that evidence or inside that furniture as it appeared. There is a lot of facts in this case that indicate that the inferences should have been drawn in favor of the Trahan family and that summary judgment should have been denied and it should have gone to the court. And I would assert that the testimony of the three living witnesses that were inside that home, Officers Broussard, Smith, and Ms. Bankston, are not uniform. Officer Broussard gives different versions of what happened between the audio he gave to the state police and his deposition. In fact, he gives multiple different versions of his own account, saying that he shot into the torso of the gentleman and then after he hit the ground, he shot him in the back. And a review of the evidence, there's a photograph of the back of Mr. Trahan that reflects a boot print on the top of Mr. Trahan's back. And it was not briefed earlier because we didn't see it, but we have seen it since and it is in evidence with this court in the record. A boot print on his back, which reflects that apparently the police officer stood on top of him and fired into his back. A description that fits the reenactment that Officer Broussard does standing in front of the patrol car for a superior officer when he indicates that he threw him down and then he reaches for his gun and he does the shape that all kids do with a gun and pow, pow, pow, straight down into his back. And drawn, taking those facts, Emerson's drawn in favor of the Trahan family. It indicates that Mr. Trahan did not put up any threat, wasn't threatening anybody, that he was securely in his own home where no one was being threatened, that he didn't need aid, he was attacked in his home, and the facts regarding the taser, the lack of wounds to him when it was fired, the disarray of the furniture in one picture versus it all being pristine in another raises serious, genuine issues of material fact that should go to a jury and should not have been decided in favor of summary judgment in favor of the police department. And with that, I'll rest. Thank you. Thank you, counsel. That concludes the matter on today's hearing.